John W. BARTLE, Appellant–Defendant,

v.

HEALTH QUEST REALTY VII, Appellee–Plaintiff.

No. 29A04–0107–CV–0292.

Court of Appeals of Indiana.

May 29, 2002.

R. Brock Jordan, Rubin & Levin, P.C., Indianapolis, IN, Attorney for Appellant.

R.C. Richmond, III, Sommer & Barnard, P.C., Indianapolis, IN, Attorney for Appellee.

## OPINION

ROBB, Judge.

John Bartle appeals the trial court's grant of partial summary judgment in favor of Health Quest Realty VII ("HQR"). We affirm.[1]

### Issue

Bartle raises the following restated issue for our review: Whether the doctrine of offensive collateral estoppel prevents Bartle from relitigating the issue of his personal liability to HQR.

### Facts and Procedural History

The facts reveal that HQR is a general partnership organized, existing, and authorized to do business under Indiana law. HQR is the lessor of leases related to four nursing home facilities (the "Facilities") in Indiana: Canterbury Village in Indianapolis; Countryside Place of Knox in Knox; Rosewood Terrace in Elkhart; and Williamsburg Village in Muncie. On July 29, 1982, Beverly Enterprises–Indiana, Inc. ("Beverly") entered into four virtually identical agreements with HQR whereupon it leased the Facilities from HQR.

In 1990, with the consent of HQR, Beverly assigned its leasehold interests in the Facilities to Delmar. Delmar leased the Facilities from HQR pursuant to the following documents: (1) Four Lease Agreements dated July 29, 1982 (collectively the "Lease Agreements"); (2) a Third Amendment to Agreement to Lease dated December 27, 1990 (the Amendment); (3) Four Assignments and Assumptions of Leases with Consent of Lessor dated December 31, 1990 (collectively the Assignments); (4) a Lease Modification dated June 11, 1992; and (5) a Rent Modification Agreement dated May 1, 1995. (The Lease Agreements, as amended and modified by the Amendment, the Assignments, the Lease Modification and Rent Modification, are referred collectively as the "Leases"). Delmar later assigned each lease to a separate Indiana limited partnership.[2]

---

1. We note that we held oral argument in the Statehouse on March 21, 2002, and we commend counsel for their advocacy.

2. The lease for Canterbury Village in Indianapolis was assigned to the Indianapolis Investors LP. The lease for Countryside Place in Knox was assigned to Knox Investors. In addition, the lease for Rosewood Terrace in Elkhart was assigned to Elkhart Investors LP. Lastly, the lease for Williamsburg Village in Muncie was assigned to Lynmar LP.

Bartle is the ninety-nine percent limited partner of Delmar. Bartle is also the majority, if not the sole shareholder of Delmar's one percent limited partner Burlington, Inc. ("Burlington"). Burlington is also Delmar's general partner. Bartle is the only officer of Burlington and Burlington conducts no business other than serving as Delmar's general partner.

On June 11, 1992, Bartle entered into an agreement with HQR whereupon he personally guaranteed the rent for the Facilities and for breach of the Leases. The Lease Modification provides in pertinent part that:

3. [Bartle] agrees to be personally liable for all rent for the Facilities and for breach of the leases....

4. If any of the Facilities fails at any time to pay all or any part of the rent then due ..., [Bartle] will immediately pay, upon written demand of [HQR], such part or all of the Debt, as the case may be, in the same manner as if it constituted the direct and primary obligation of [Bartle], and such obligation of [Bartle] shall be due with costs of collection, attorneys' fees and without relief from valuation or appraisement laws or any other laws of exemption, which [Bartle] hereby waives.

Appellee's Appendix at 301. Under Section 24.1A of the Leases, an Event of Default occurs if the tenant fails to pay any payment required under the Leases when due, and such default continues for ten (10) days after written notice of such default.

On October 29, 1998, HQR gave Delmar and Bartle written notice of default under the Leases and demanded payments of the amounts owed. On November 6, 1998, Delmar filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Indiana, Indianapolis Division (the "Bankruptcy Court").

On March 1, 1999, HQR filed with the Hamilton Superior Court a Complaint To Recover On Guaranty seeking judgment against Bartle for the full amount of the debt owed by Delmar to HQR plus the costs of collection, court costs, and attorneys' fees. The Complaint To Recover On Guaranty alleges in pertinent part that:

4. Pursuant to the Lease Modification, Bartle agreed to be personally liable for all rent for the [nursing home facilities], and for breach of the Leases.

5. Under Section 24.1A of the Leases, it constitutes an Event of Default if the tenant fails to pay any payment required under the Leases when due, and such default continues for ten (10) days after written notice of such default.

6. Delmar is in default under the Leases, having failed to pay rent, taxes, and other charges due under the Leases totaling over $2.2 Million (the "Debt"), despite written notice and demand for payment given to Delmar and Bartle on or about October 29, 1998....

7. Pursuant to the Lease Modification, Bartle is obligated to immediately pay the Debt to HQR, together with HQR's cost of collection and attorneys' fees, and without relief from valuation and appraisement laws.

Appellant's Appendix at 14. On April 16, 1999, Bartle filed with the trial court his Answer and Affirmative Defenses to Plaintiff's Complaint to Recover on Guaranty.

On January 3, 2000, Bartle moved to intervene generally in Delmar's case before the Bankruptcy Court. The Bankruptcy Court conducted a three-day hearing beginning on January 19, 2000, for the purpose of determining the obligations owed to HQR by Delmar under the Leases. Bartle was present during the entirety of the hearing and in fact testified. On February 12, 2000, HQR filed with the Bankruptcy Court a motion requesting

that the trial court calculate the amount Delmar owed to HQR for attorneys' fees.

On February 14, 2000, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order with regard to Delmar's liability under the Leases. The Bankruptcy Court determined the obligations owed to HQR by Delmar under the Leases as follows:

 (a) The sum of $871,579.08 is due, as of January 20, 2000, for net rent delinquencies with interest accruing on said sum.

 (b) The sum of $519,525.04 is due, as of January 20, 2000, for taxes advanced by HQR with interest accruing on said sum.

 (c) The sum of $42,966.97 is due to the taxing authorities with respect to Canterbury Village, with interest accruing on said sum.

 (d) HQR is entitled to reasonable attorney fees and expenses, which sum shall be determined at a later date by this Court.

Appellant's Appendix at 33–34. On February 24, 2000, Delmar filed with the Bankruptcy Court a Motion to Reconsider and to Open and Amend Judgment. Four days later, Delmar withdrew the motion and neither Delmar nor Bartle appealed the order.

On April 24, 2000, the Bankruptcy Court entered a Stipulation and Order on Application for Attorney Fees and Expenses, in which Delmar stipulated, and the Bankruptcy Court found, that Delmar was liable to HQR for attorney fees and expenses totaling $206,506.09. Thus, the Bankruptcy Court found Delmar liable to HQR for $871,579.08 in net rent, plus $519,525.04 in taxes, plus an additional $42,966.97 in taxes, plus $206,506.09 in attorneys' fees, totaling $1,640,577.18.

On September 27, 2000, HQR filed with the trial court a motion for partial summary judgment. HQR argued that it was entitled to judgment as a matter of law on all issues, other than the amount of attorneys' fees incurred in prosecuting its current claim, pursuant to the doctrine of offensive collateral estoppel. Specifically, HQR maintained that all other factual issues were conclusively resolved in the previous proceeding conducted before the Bankruptcy Court. On January 26, 2001, Bartle filed his response to HQR's motion for partial summary judgment. Following a hearing, the trial court issued an order on May 9, 2001, concluding in part that "the Court finds that the Bankruptcy Court's Order is res judicata as to Delmar's Obligations to HQR under the Leases, and that HQR is entitled to offensively assert collateral estoppel against Bartle to preclude Bartle from relitigating the issues previously determined by the Bankruptcy Court in its Order with respect to Delmar's Obligations to HQR under the Leases." Appellant's Appendix at 11–12. This appeal ensued.

### Discussion and Decision

Bartle contends that the trial court erred in granting partial summary judgment in favor of HQR. We disagree.

### I. Standard of Review

In reviewing a motion for summary judgment, we apply the same standard as the trial court, and we resolve any question of fact or an inference to be drawn therefrom in favor of the non-moving party. *Foster v. Evergreen Healthcare, Inc.*, 716 N.E.2d 19, 23–24 (Ind.Ct.App.1999), *trans. denied*. Summary judgment is appropriate only if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C).

Once the moving party has met this burden with a prima facie showing, the burden shifts to the non-moving party to demonstrate that there is a genuine issue of material fact for trial. *Jacques v. Allied Bldg. Servs. of Indiana*, 717 N.E.2d 606, 608 (Ind.Ct.App.1999). Any doubt about

the existence of a factual issue should be resolved against the movant, with all properly asserted facts and reasonable inferences construed in favor of the nonmovant. *Schrader v. Eli Lilly & Co.*, 639 N.E.2d 258, 261 (Ind.1994). The party appealing the grant of a motion for summary judgment bears the burden of persuading this court that the trial court erred. *Foster*, 716 N.E.2d at 24.

## II. Collateral Estoppel

■ Issue preclusion, often referred to as collateral estoppel, bars the subsequent litigation of a fact or issue which was necessarily adjudicated in a former lawsuit if the same fact or issue is presented in the subsequent lawsuit. *Shell Oil Co. v. Meyer*, 705 N.E.2d 962, 968 (Ind.1998). In that situation, the former adjudication will be conclusive in the subsequent action even if the two actions are on different claims. *Sullivan v. American Cas. Co.*, 605 N.E.2d 134, 137 (Ind.1992). However, the former adjudication will only be conclusive as to those issues which were actually litigated and determined therein. *Wedel v. American Elec. Power Serv. Corp.*, 681 N.E.2d 1122, 1131 (Ind.Ct.App.1997), *trans. denied.*

■ Collateral estoppel does not extend to matters which were not expressly adjudicated and can be inferred only by argument. *Peterson v. Culver Educ. Found.*, 402 N.E.2d 448, 461 (Ind.Ct.App. 1980). The primary consideration in the use of collateral estoppel is whether the party against whom the former adjudication is asserted had "a full and fair opportunity to litigate the issue and whether it would be otherwise unfair under the circumstances" to permit the use of issue preclusion in the subsequent action. *Sullivan*, 605 N.E.2d at 138. Review of a trial court's decision regarding the use of issue preclusion is subject to an abuse of discretion standard. *Shell Oil*, 705 N.E.2d at 969.

■ Collateral estoppel has been divided into two categories: "offensive" collateral estoppel and "defensive" collateral estoppel. *Tofany v. NBS Imaging Sys., Inc.*, 616 N.E.2d 1034, 1037 (Ind.1993). Offensive collateral estoppel involves a situation where the " 'plaintiff seeks to foreclose the defendant from litigating an issue the defendant had previously litigated unsuccessfully in an action with another party.' " *Id.* (quoting *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)). Defensive collateral estoppel involves a situation where a "defendant seeks to prevent a plaintiff from asserting a claim which the plaintiff had previously litigated and lost." *Id.* The present case involves offensive use of collateral estoppel; HQR is seeking to estop Bartle from relitigating at the trial court the issue of his personal liability under the Leases, an issue HQR alleges Bartle previously litigated and lost against HQR in the action before the Bankruptcy Court.

■ The offensive use of collateral estoppel has traditionally been viewed as somewhat more problematic than the defensive use of collateral estoppel.[3] Howev-

---

3. In *Parklane Hosiery*, the United States Supreme Court examined the two general challenges to offensive collateral estoppel: (1) the use of offensive collateral estoppel does not promote judicial economy as well as defensive collateral estoppel because it encourages potential plaintiffs to wait for a favorable outcome and assert prior judgments against defendants rather than providing them incentive to intervene in the first action; and (2) unfair-

ness to the defendant may result from the use of offensive collateral estoppel. Based on the foregoing reasons, the United States Supreme Court set forth certain factors to be considered in allowing the use of offensive collateral estoppel, factors which were adopted by the Indiana Supreme Court. *Tofany v. NBS Imaging Sys., Inc.*, 616 N.E.2d 1034, 1038 (Ind. 1993) (citing *Parklane Hosiery*, 439 U.S. 322, 330–32, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)).

er, the Indiana Supreme Court has held that offensive collateral estoppel may be used, subject to certain requirements, as it tends to prevent unnecessary relitigation of issues and promotes consistent trial court judgments. *Tofany*, 616 N.E.2d at 1038. Determining the appropriateness of offensive collateral estoppel involves two considerations: (1) whether the party to the prior action had a full and fair opportunity to litigate the issue; and (2) whether it is otherwise unfair to apply collateral estoppel given the facts of the particular case. *Id.; see Sullivan*, 605 N.E.2d at 138. If the two elements are fulfilled, then a court may apply collateral estoppel to prevent relitigation of the same issue. *Eichenberger v. Eichenberger*, 743 N.E.2d 370, 375 (Ind.Ct.App.2001).

In *Tofany*, the Indiana Supreme Court discussed the factors to be considered in a court's determination of whether offensive collateral estoppel should be utilized. 616 N.E.2d at 1038. The court stated that:

> The trial court may consider privity, the defendant's incentive to litigate the prior action, the defendant's ability to defend the prior action, and the ability of the plaintiff to have joined the prior action. When considering the defendant's incentive to litigate, the trial court may consider the interest at stake for the defendant as well as how the defendant perceived this interest. For example, did the defendant have its most experienced litigator in the prior action or, instead, did the defendant rely on a less experienced litigator? Similarly, the trial court may consider whether the forum in which the action was defended allowed the defendant to participate in the full range of discovery. For example, was the forum inconvenient thus preventing the defendant from presenting witnesses or from taking depositions.

*Id.* at 1038–39. Our supreme court added that these factors were not exhaustive; rather they merely provided the framework for a court to utilize in its determinations. *Id.* at 1038.

### III. Bartle's Arguments

Bartle asserts that it was erroneous for the trial court to apply the doctrine of offensive collateral estoppel for the following reasons: (1) privity was not established with the true parties in interest, an absolute requirement of collateral estoppel; (2) he did not have an incentive to litigate his underlying liability under the Leases before the Bankruptcy Court; and (3) he was not afforded an opportunity to assert his defense of impairment of collateral because the issue of the Guaranty was not before the Bankruptcy Court.

### A. Privity

The term "privity" describes the relationship between persons who are parties to an action and those who are not parties to an action but whose interests in the action are such that they may nevertheless be bound by the judgment in that action. *Small v. Centocor, Inc.*, 731 N.E.2d 22, 27–28 (Ind.Ct.App.2000), *trans. denied*. The term includes those who control an action, though not a party to it, and those whose interests are represented by a party to the action. *Id.* The Restatement of Judgments provides that:

> If [a] corporation is closely held, in that one or a few persons hold substantially the entire ownership in it, the judgment in an action by or against the corporation or the holder of ownership in it, the judgment in an action by or against the corporation or the holder of ownership in it is conclusive upon the other of them as to issues determined therein as follows:
>
> ... The judgment in an action by or against the corporation is conclusive

upon the holder of its ownership if he actively participated in the action on behalf of the corporation, unless his interests and those of the corporation are so different that he should have opportunity to relitigate the issue....

Restatement (Second) of Judgments § 59(3).[4] Bartle asserts that privity is an absolute requirement of offensive collateral estoppel and that privity was never established with the true parties in interest, the limited partnerships. Bartle further asserts that even if Delmar is the true party in interest, collateral estoppel is inappropriate because he attended the Bankruptcy Hearing in a representative capacity on behalf of Delmar, not a personal one. HQR asserts that privity is no longer an absolute requirement for offensive collateral estoppel. HQR further asserts that Delmar is the true party in interest, not the limited partnerships, and that Bartle and Delmar are essentially one and of the same.

 Traditionally, Indiana required mutuality of estoppel and identity of parties before collateral estoppel could be invoked. *Tobin v. McClellan*, 225 Ind. 335, 73 N.E.2d 679, 683 (1947); *Town of Flora v. Indiana Serv. Corp.*, 222 Ind. 253, 53 N.E.2d 161, 163 (1944). "Mutuality of estoppel" refers to the requirement that "one taking advantage of the prior adjudication would have been bound had the prior judgment gone the other way." *State v. Speidel*, 181 Ind.App. 448, 392 N.E.2d 1172, 1177 (1979). "Identity of parties" refers to the requirement that the party to be bound by a prior adjudication must be the same as or in privity with the party in the prior action. *Id.* at 1176. Thus, in the past, a stranger to the judgment, one who was neither a party nor in privity with a party to the prior judgment, was not permitted to take advantage of collateral estoppel in the subsequent action. *Id.*

In *Sullivan,* the Indiana Supreme Court rejected the requirements of "mutuality of estoppel" and "identity of parties" as prerequisites to the *defensive* use of collateral estoppel. 605 N.E.2d at 137. Instead, our supreme court held that to determine whether the *defensive* use of collateral estoppel is appropriate, a court is to consider whether the party against whom the judgment is pled had a full and fair opportunity to litigate the issue and whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel. *Id.* at 138. However, the Court in

---

4. Comment to this section provides that:
 When the corporation is closely held, ... interests of the corporation's management and stockholders and the corporation itself are few in number and either themselves constitute the management or have direct personal control over it. In many respects, the enterprise is a proprietorship or partnership conducted in corporate form.... When the form is adequately adhered to, the fact that interests of a closely held corporation and its proprietors are usually identical does not efface the separate legal identity of the corporation for such purposes as taxation, regulation, and the limitation of shareholders' liability to their investment in the corporation. For the purpose of affording opportunity for a day in court on issues contested in litigation, however, there is no good reason why a closely held corporation and its owners should be ordinarily regarded as legally distinct. On the contrary, it may be presumed that their interests coincide and that one opportunity to litigate issues that concern them in common should sufficiently protect both.

 The problem then becomes one of fair opportunity to litigate the issue in question. When the corporation is the party to the litigation, a controlling owner who participates in the conduct of the litigation ordinarily has full opportunity and adequate incentive to litigate the issues commonly affecting him and the corporation.
 Restatement (Second) of Judgments, § 59 cmt e.

*Sullivan* did not address the appropriateness of or requirements for the *offensive* use of collateral estoppel. In *Tofany,* the Court stated that privity was just a factor to be considered by a trial court when determining the appropriateness of *offensive* collateral estoppel. 616 N.E.2d at 1038. Thus, HQR is correct that privity is not an absolute requirement of offensive collateral estoppel. Rather, it is a factor to be considered in the determination of whether issue preclusion prevents relitigation of Bartle's personal liability under the Leases. The question remains who is the true party in interest, the limited partnerships or Delmar, and whether or not Bartle is in privity with that entity.

Bartle argues Delmar is not the true party in interest because Delmar assigned the Leases to limited partnerships prior to the hearing before the Bankruptcy Court. Bartle further argues that privity does not exist with the limited partnerships because he never held a controlling interest in them. Therefore, Bartle asserts that Delmar was not the proper party to contest HQR's Motion for Determination of Lease Obligations and the fact that he attended the hearing before the Bankruptcy Court as a representative of Delmar is insufficient to establish privity with the limited partnerships.

The Assignments entered into between Beverly, Delmar, and HQR provide in pertinent part that:

> This Assignment shall inure to the benefit of and be enforceable by [Beverly] and [Delmar] and their respective successors and permitted assigns provided that [Delmar] shall not assign its liabilities or obligations under the Lease without (i) complying with the provisions

concerning assignment in the Lease to be assigned; and (ii) the prior written consent of [Beverly], which consent shall not be unreasonably withheld. [Delmar] may assign the Lease along with all of the rights, duties, and obligations arising thereunder to one or more, but not more than six (6)[5] newly formed limited partnerships of which John W. Bartle ("Guarantor"), or a corporation owned solely by the Guarantor, is a general partner. Any assignment to such limited partnerships shall not relieve [Delmar] or the Guarantor from any obligation arising under the Lease or the Assignment Agreement or any documents executed in connection with the Assignment Agreement, and all such assignments shall be effectuated by documents satisfactory to [Beverly], in its sole *discretion.* All the terms and provisions of the Lease, so assigned, shall be binding upon and inure to the benefit of and be enforceable by [Delmar] and [Beverly] and their respective permitted successors and assigns.

Appellee's Appendix at 261–62, 273–74, 284–85, 295–96 (footnote added). Therefore, we find that Delmar was the true party in interest, not the limited partnerships, because any assignment to the limited partnerships did not relieve Delmar or Bartle of the obligations arising under the Leases. We must now determine whether Bartle is in privity with Delmar.

The record reveals that Bartle is the ninety-nine percent limited partner of Delmar. Bartle is also the majority, if not sole shareholder[6] of Delmar's other one percent limited partner, Burlington, which is also Delmar's general partner. Bartle is

---

**5.** There were two additional leases besides the four that are part of this appeal. However, for our purposes, these two additional leases are irrelevant.

**6.** Bartle testified that he was uncertain of his percentage in Burlington, but stated that he does control the entity and that no other individual owns stock in Burlington except maybe his wife. Appellant's Appendix at 216.

the only officer and employee of Burlington, and Burlington conducts no business other than serving as Delmar's general partner.[7] Therefore, it is clear that Bartle is in privity with the true party in interest, Delmar. Thus, this factor supports the trial court's use of collateral estoppel against Bartle with regard to his personal liability under the Leases for all rent of the Facilities.

### B. Incentive to Litigate

The Indiana Supreme Court has stated that unfairness to a defendant against whom collateral estoppel is asserted may result where the defendant had little incentive to vigorously litigate the first action either because the damages were small or nominal, or because future suits were not foreseeable. *Tofany*, 616 N.E.2d at 1038 (quoting *Parklane Hosiery*, 439 U.S. at 330–31, 99 S.Ct. 645). "When considering the defendant's incentive to litigate, the trial court may consider the interest at stake for the defendant as well as how the defendant perceived this interest." *Tofany*, 616 N.E.2d at 1039.

 Bartle asserts that he had "different" incentives to litigate the two proceedings and thus, offensive collateral estoppel should not have been utilized. In support of his argument, Bartle provides that the proceeding before the Bankruptcy Court was to determine the amount of rent liability in order to ascertain if Delmar could feasibly assume and cure the Leases. In contrast, the proceeding before the trial court concerned HQR's request for a personal judgment against him in excess of 1.6 million dollars.

HQR asserts that Bartle was well aware at the hearing before the Bankruptcy Court that HQR was looking to Bartle to personally satisfy Delmar's obligations to HQR. HQR provides that at that time, its action seeking recovery against Bartle on his guarantee of the Leases already had been pending in the trial court for almost one year. Moreover, HQR argues that because Bartle is the ninety-nine percent limited partner of Delmar and the majority, if not sole, shareholder of Burlington, every single dollar that was determined by the Bankruptcy Court to be owed by Delmar to HQR reduced by a dollar the value of Bartle's interest in Delmar.

The record reveals that Bartle intervened generally in the proceeding before the Bankruptcy Court. Moreover, Bartle was present during the hearing before the Bankruptcy Court and in fact testified. In addition, the record reveals that Bartle maintained close contact with the attorney litigating the suit on behalf of Delmar throughout the pendency of the bankruptcy action. In fact, it appears that Bartle was kept up-to-date by Delmar's counsel and made all of the strategic decisions on behalf of the entity. Bartle and Delmar are essentially one entity. Bartle is the ninety-nine percent limited partner of Delmar. Bartle is also the majority, if not sole shareholder of Delmar's other one percent limited partner, Burlington, which is also Delmar's general partner. Thus, we hold that Bartle had an incentive to litigate the issue of liability before the Bankruptcy Court because his liability rests upon liability on the part of Delmar.

### C. Defense of Impairment of Collateral

Bartle next argues that the trial court erred in using offensive collateral estoppel because he was not afforded the opportuni-

---

**7.** Judge Frank J. Otte of the Bankruptcy Court observed at the hearing that:

> Well, ... if Delmar has a meeting, Mr. Bartle, in order to have more than one ... person there, he's got to sit in a room with

a mirror. This whole thing is just Mr. Bartle. I mean, we can call it Delmar, Jim–Mar ..., I mean, all these things is just this guy sitting right here.

Appellant's Appendix at 219.

ty to assert his defense of impairment of collateral due to the fact that the issue of the guaranty was not before the Bankruptcy Court. The record reveals that the issue of the guaranty was not before the Bankruptcy Court, only the liability for all rent of the Facilities. Therefore, it was not an issue litigated previously and offensive collateral estoppel would not necessarily prevent Bartle from relitigating his guaranty liability relative to the leases to HQR. However, the issue of the guaranty was part of the motion for summary judgment.

 The guarantor of a debt may seek to avoid personal liability in a suit by a creditor by asserting the impairment of collateral defense. *Farmers Loan & Trust Co. v. Letsinger,* 652 N.E.2d 63, 66 (Ind. 1995). Pursuant to this defense, the guarantor's liability will be discharged if the facts establish that the creditor's conduct unjustifiably impaired the collateral securing the debt. *Alani v. Monroe County Bank,* 712 N.E.2d 19, 21 (Ind.Ct.App. 1999). In discussing the reason behind this defense, our supreme court has stated:

> That a guarantor may interpose the defense that a creditor impaired the collateral makes sense for two reasons. First, the guarantor at the time of making a guaranty may make the judgment that the collateral for the loan to the guarantor's principal will be sufficient to cover the debt. If the creditor impairs the collateral, and the guarantor has not consented to release or other impairment of the collateral, the guarantor may become exposed to liability beyond the guarantor's expectation at the time the parties entered into the contract. * * *
>
> Second, a guarantor who satisfies the principal debtor's obligation to the creditor generally steps into the shoes of the creditor, becoming subrogated to the creditor's claim and assuming both the

creditor's rights and duties. Thus, when a creditor unjustifiably impairs the collateral securing a guarantied loan, it impairs the guarantor's recourse against the guarantor's principal, which recourse the guarantor would have understood itself to have at the time of contracting to guaranty the principal's debt.

*Letsinger,* 652 N.E.2d at 66–67 (citations omitted).

With regard to his defense of impairment of collateral, Bartle directs our attention to the right of first refusal provision contained in the July 29, 1982, lease agreements entered into between Beverly and HQR. This provision provides as follows:

> [HQR] does hereby give to [Beverly] the right of first refusal to purchase the Nursing Home or Nursing Home Equipment on the same terms and conditions as offered by any other bona fide offeror during the term of this Lease, as the same may be extended, which [HQR] proposes to accept. The said offeror shall not be related to, affiliated with or under common control with [HQR], or any of the parties involved in the other Leases. [HQR] shall give to [Beverly] written notice that it contemplates sale of the Nursing Home or Nursing Home Equipment and the terms and conditions of any such bona fide offer which it finds satisfactory and [Beverly] shall be given thirty (30) days after receipt of such written notice within which to exercise in writing the right herein to acquire the Premises on substantially the same terms and conditions. In the event of the failure of [Beverly] to accept such offer within the thirty (30) day period as herein provided, then the privilege herein given of right of first refusal shall thereafter be null and void as to such offer only and [HQR] shall be at liberty to sell the Nursing Home or Nursing Home Equipment to the other offeror

within the next succeeding one (1) year period. Such sale, however, shall be subject to this Lease and all of the terms, covenants and conditions hereof. [HQR] may not effect a sale on terms which vary in any material respect from that offered to [Beverly].

Appellee's Appendix at 58, 118, 180, 242. Because HQR consented to Beverly's assignment of its leasehold interests in the Facilities to Delmar in 1990, Delmar was granted the right of first refusal contained in this contractual provision.

Bartle argues that the November 17, 1992, agreement entered into between HQR and Beverly impaired the value of Delmar's leasehold interests by granting Beverly the option to purchase the Facilities. This agreement, titled Fourth Amendment to Agreement to Lease, provides in pertinent part that "Beverly shall have the right to purchase the Properties as set forth herein." R. 189. Even if we assume this agreement impaired the leasehold interests, it does not affect Bartle's agreement to be personally liable for all rent of the Facilities under the Lease Modification Agreement. *See* Appellee's Appendix at 301. Moreover, Bartle failed, before the trial court, to demonstrate that there was a genuine issue of material fact for trial regarding his assertion that he was released from the obligations under the Guaranty due to the impairment of collateral.

Accordingly, we hold that the trial court did not err in using the doctrine of offensive collateral estoppel to preclude Bartle from relitigating his underlying liability under the Leases to HQR and since Bartle raised no issue as to a material fact that would support a finding that his guaranty was discharged the trial court properly granted partial summary judgment in favor of HQR against Bartle on this issue.

*Conclusion*

Based on the foregoing, we hold that the trial court properly granted partial summary judgment in favor of HQR against Bartle.

Affirmed.

KIRSCH, J., and SULLIVAN, J., concur.