**In re the COMMITMENT OF Marcia HEALD,**

**Marcia Heald, Appellant–Respondent,**

**v.**

**Dana Blank, Superintendent, Indiana Women's Prison, Appellee–Petitioner.**

No. 49A05–0208–CV–386.

Court of Appeals of Indiana.

March 20, 2003.

Janice L. Stevens, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

The Indiana Department of Correction filed a Petition for Involuntary Commitment pursuant to Indiana Code chapter 12–26–7,[1] alleging that Marcia Heald ("Heald") suffers from a psychiatric disorder, is a danger to herself and others, and is gravely disabled. Appellant's App. pp. 9–10. A commitment hearing was held on July 25, 2002, and after hearing evidence, the court found Heald to be mentally ill, a danger to others, and gravely disabled. Consequently, the court ordered her committed to Evansville State Hospital until she is discharged or until the court terminates her commitment. Heald raises two restated issues for review:

1. Whether the doctrine of collateral estoppel precludes the State from proceeding with a commitment hearing when the State had the opportunity to have Heald committed twenty years ago prior to Heald's murder trial, and;

2. Whether the trial court erred in concluding that there was clear and convincing evidence to warrant Heald's commitment.

Finding the doctrine of collateral estoppel inapplicable and sufficient evidence to support the trial court's commitment of Heald, we affirm.

**Facts and Procedural History**

Heald was born on August 1, 1938 and raised in Indiana as a Quaker. She received an English degree from Earlham College and attended graduate school at Indiana University. She is now divorced and has two adult sons, ages thirty-five and thirty-seven.

In 1983, Heald began serving a forty-year term of imprisonment at the Indiana Women's Prison ("Prison") for a murder that she committed on August 2, 1982. *See Heald v. State*, 492 N.E.2d 671 (Ind. 1986). Before committing this crime, Heald had no criminal history.

The facts of Heald's murder conviction pertinent to the case at bar reveal that Brian Thornton ("Thornton") was a mutual friend of Heald, and Heald's murder victim, Shelley Smith ("Smith"). Heald developed a delusional pattern of thought in which she perceived Thornton to be Jesus Christ, herself to be Eve, a missionary from God or the Mother Mary, and Smith as the temptress of Christ. As a result of this delusion, Heald broke into Smith's home, attacked Smith with a knife while Smith was asleep in bed, and brutally murdered and attempted to decapitate Smith.

At trial, Heald presented the defense of "insanity at the time of the crime." Consequently, the jury had the option of finding Heald: (1) guilty, (2) not guilty, (3) guilty but mentally ill, or (4) not responsible by reason of insanity at the time of the crime. *See* Ind.Code § 35–36–2–3. The jury found Heald guilty as charged.

Heald completed her sentence on July 28, 2002. During her incarceration, Heald was considered a good inmate. She only received a couple of minor conduct reports and had not been violent or aggressive in the twenty years she had been at the

---

1. Ind.Code § 12–26–7 (2001).

prison. While in prison, Heald worked in the print shop vocational program and actively participated in other various programs, including the "Clown Ministry" and several church-related activities. Heald also worked as a prison tutor, and her prison record contains several letters of recognition for her prison-volunteer work.

Although Heald regularly attended prison-counseling sessions, she refused psychotropic medication while incarcerated, and her delusions persisted throughout her prison sentence. On June 27, 2002, a month before she was to be released from prison, Heald sent the following letter to the Boone County Clerk of Court:

> I am once more inquiring about the disposition of the hat of the Righteous One of Israel which has been in your keeping since my trial in the Boone County Superior Court in 1983 (Cause No.S6929).
>
> Ms. Tammy Hunter, my transition coordinator at Indiana Women's Prison, has made several telephone inquires [sic] to your office, the prosecutor's office, the sheriff's department, and also the police and sheriff's departments as well as the courts in Tippecanoe County trying unsuccessfully to locate the hat. Everyone she has talked to says the hat is gone and they have no idea where it went or when.
>
> The misplacing of the hat of the Righteous One of Israel creates a huge public safety menace as the taxpayers of Tippecanoe County found on August 2, 1998 when their courthouse was bombed on my 16th anniversary.[2] I recently learned that the people in possession of the hat are the ones who fire-bombed the courthouse. They apparently believed that the hat was a plaything and

put it on their own heads in jest. This violates the command of YHWH, Most High God of the Universe, that only the anointed one may wear the hat.

> For my own protection, I am requesting an affidavit from your office regarding disposition of the hat. I need to have proof of where the hat went and who authorized its removal or destruction so that I will be exonerated from all blame. The blathering idiot who removed the hat from the Boone County Courthouse can be charged with collusion in the Tippecanoe County fire-bombing because giving the hat to an unauthorized person is like giving a loaded gun to a five year old child who believes the gun is a toy.
>
> I do not, incidentally, believe that the hat was destroyed as that blathering idiot planned. The hat is very fair and attractive and fey. Anyone who saw it on the garbage heap would be bound to retrieve it as a boon souvenir.
>
> I can devise a way to get the hat back. If you are willing to put up a reward of several thousand dollars and advertise in the right places as I shall direct you. Also, I will have to identify the hat from photos submitted by the prospective reward seeker. This will require a sting operation and much patience, but it will be worth your time and trouble because the person who comes forward with the hat of the Righteous One of Israel will be the Tippecanoe Courthouse bomber.

Petitioner's Exhibit 1.

On July 10, 2002, the superintendent of the Prison filed a Petition for Involuntary Commitment of Heald pursuant to Indiana Code chapter 12–26–7. The hearing on this petition was held on July 25, 2002.

---

**2.** Heald is apparently referring to the sixteenth "anniversary" of the murder she committed.

Dr. Richard Payne, Dr. Paul Shriver, and John Bahret testified at this hearing.

Dr. Payne is a licensed medical doctor and psychiatrist who has worked at the Prison since 1997. Dr. Payne examined Heald once in 2001 and met with her several times during a thirty-day period before the commitment hearing. Dr. Payne presented a written report of his psychiatric evaluation of Heald on June 28, 2002, pursuant to Indiana Code section 12–26–7–2.[3] Appellant's App. pp. 13–15.

Dr. Payne concluded that Heald is a very nice, intelligent person, who is a grandmother figure to the inmates, but is severally mentally ill. Tr. p. 12. He testified that Heald was suffering from paranoid schizophrenia, explaining that "[Heald] has a complex delusional system. In fact, the most complex that I have ever seen, because she is very highly intelligent but feels she is half-human and half-angel. She feels that she is a warrior-type angel" and that she had to protect Thornton, whom she perceives as Christ, from the murder victim, who Heald knew from a past life 5000 years ago. Appellant's App. p. 14; Tr. pp. 12–13, 14. Dr. Payne further testified that Heald believes that she is on a religious quest from God, and that she did the right thing when she committed the murder because "[Heald] felt the woman was a snake that she needed to cut the head off." Tr. p. 12.

Dr. Payne questioned Heald's ability to take care of herself because she still suffers from the same delusions that were responsible for the murder of Smith. For this reason, Dr. Payne testified that Heald presents a danger to herself and others, especially under stress. Tr. pp. 12, 15, 17. Dr. Payne further remarked that Heald's insight and judgment are extremely poor, "there is a marked paranoid ideation in

Heald," and when pressed with pertinent issues, she can be easily disturbed. Appellant's App. p. 14.

Dr. Payne concluded by expressing his concern that, based on his past experiences with Heald, her June 27, 2002 letter to the Boone County Clerk might be a sign that "[Heald] wants to take up where she left off in the delusional-religious experience." For these reasons, Dr. Payne recommended that Heald receive inpatient treatment at a psychiatric facility and psychiatric medication. Appellant's App. pp. 14–15; Tr. p. 16.

Dr. Shriver is a psychologist who works at the Prison. Dr. Shriver met Heald when she became incarcerated at the Prison, and has seen her regularly ever since. Dr. Shriver diagnosed Heald with "delusional disorder." He further testified that recently the Harvard Mental Health Newsletter reported that psychotherapy is as effective or more effective in treating delusional disorders than medication. Tr. p. 28. Unlike Dr. Payne, Dr. Shriver does not believe Heald is a danger to herself and believes the probability that she would present any direct threat of violence to others to be very low. Tr. pp. 28–29.

John Bahret ("Bahret") has known Heald for twelve years. He saw her twice a week for eight years when he worked in the Prison Ministry, and he has maintained contact with Heald during the four years of his retirement. Bahret testified that a loving and supportive environment would be beneficial to Heald and that Heald could get that needed support from Holy Cross Church and the Prison Ministry in Indianapolis. Tr. p. 41. Bahret also testified that if Heald were transferred to the State facility at Evansville for psychotropic treatment, it would be great for him "because that is right across the river."

**3.** Ind.Code § 12–26–7–2 (2001).

Tr. pp. 40–41. No other friends or family members testified at the hearing, and the record shows Bahret as the only one who has indicated any willingness to visit Heald.

The trial court determined that Heald is mentally ill due to a psychiatric disorder, namely paranoid schizophrenia, which substantially disturbs her thinking, feeling, behavior, and ability to function. Appellant's App. p. 6. The trial court also found that Heald presents a substantial risk of danger to others and is gravely disabled. *Id.* Consequently, the trial court concluded that Heald is in need of commitment to an appropriate facility for custody, care, and treatment for a period to exceed ninety days.

### Discussion and Decision

Heald asserts that the decision of the trial court should be reversed because (1) doctrine of collateral estoppel precludes the State from committing Heald and (2) there was insufficient evidence presented by the State to support the trial court's finding that Heald poses a danger to others or is gravely disabled.

### I. Collateral Estoppel

Heald asserts that collateral estoppel precludes the trial court from entertaining the State's motion to commit Heald on the basis of her mental illness, because a jury, despite Heald's claim of insanity, has already determined that Heald was not mentally ill when it convicted her of murder twenty years ago. In making this argument, Heald asserts that the State failed to present any evidence at her involuntary commitment hearing that was not related to her insanity defense rejected by the jury twenty years ago at her murder trial. The State asserts that collateral estoppel cannot apply to the case at bar because (1) Heald waived her right to assert collateral estoppel as a result of her failure to explicitly raise the defense at trial and (2) when

Heald presented her insanity defense, it concerned her mental competency at the time of her murder trial twenty years ago, whereas the commitment hearing concerned her current mental competency.

■ Collateral estoppel—also referred to as issue preclusion—bars the subsequent litigation of an issue necessarily adjudicated in a former suit. *Shell Oil v. Meyer*, 705 N.E.2d 962, 968 (Ind.1998). However, the former adjudication will only be conclusive to those issues which were actually litigated and determined therein. *Bartle v. Health Quest Realty VII*, 768 N.E.2d 912, 917 (Ind.Ct.App.2002), *trans. denied* (citing *Wedel v. American Elec. Power Serv. Corp.*, 681 N.E.2d 1122, 1133 (Ind.Ct.App.1997), *trans. denied* ).

■ Collateral estoppel does not extend to matters that were not expressly adjudicated or to matters that can be inferred from the prior adjudication only by argument. *Id.* (citing *Peterson v. Culver Educ. Found.*, 402 N.E.2d 448, 461 (Ind. Ct.App.1980)). There is no estoppel where anything is left to conjecture as to what was necessarily involved and decided in the prior adjudication, as where the judgment, which might have been based upon one of several grounds, does not show which ground it was based upon. *Id.; see also Conn. Indem. Co. v. Bowman*, 652 N.E.2d 880, 883 (Ind.Ct.App.1995), *trans. denied* (noting that "where a judgment may have been based on either of two or more distinct facts, a party desiring to plead the judgment as estopped by verdict or finding [yet another term for collateral estoppel] upon the particular facts involved in a subsequent suit, must show that the judgment was determined on that fact or else the question will be open to new contention").

■ Collateral estoppel can operate either defensively or offensively. *Bartle,*

768 N.E.2d at 917. Defensive collateral estoppel involves a situation where a defendant seeks to prevent a plaintiff from asserting a claim that the plaintiff had previously litigated and lost. *Parklane Hosiery Co. Inc. v. Shore*, 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *see also Tofany v. N.B.S. Imaging Sys. Inc.*, 616 N.E.2d 1034, 1037 (Ind. 1993). A prime consideration in the defensive use of collateral estoppel is whether the party against whom the prior judgment is asserted had a full and fair opportunity to litigate the issue and whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel. *Sullivan v. Am. Cas. Co.*, 605 N.E.2d 134, 138 (Ind.1992); *see also Pritchett v. Heil*, 756 N.E.2d 561, 565 (Ind. Ct.App.2001); *Hendrickson v. Alcoa Fuels, Inc.*, 735 N.E.2d 804, 812 (Ind.Ct.App. 2000).

Conversely, offensive collateral estoppel is where the plaintiff seeks to foreclose the defendant from litigating an issue that the defendant had previously litigated unsuccessfully in an action with another party. *Parklane Hosiery*, 439 U.S. at 326 n. 4, 99 S.Ct. 645; *see also Doe v. Tobias*, 715 N.E.2d 829, 831 (Ind.1999). Determining the appropriateness of offensive collateral estoppel involves two considerations: (1) whether the party to the prior action had a full and fair opportunity to litigate the issue, and (2) whether it is otherwise unfair to apply collateral estoppel given the facts of a particular case. *Bartle*, 768 N.E.2d at 918.

Finally, although differing burdens of proof can preclude the results reached in a criminal proceeding from being used for collateral estoppel purposes in civil cases, dicta in *Turner v. Estate of Turner*, 454 N.E.2d 1247, 1249 n. 2 (Ind.Ct.App. 1983), suggests that such an application of collateral estoppel would be permissible in circumstances where the burden of proof employed by a criminal proceeding would not cast doubt on the reliability of estoppel. *See id.*

### A. *Waiver*

The State claims that the applicability of collateral estoppel is not a proper issue for appeal in this case because Heald failed to raise the issue at trial. However, in *Wedel*, this Court held that even if a party's treatment of collateral estoppel is underdeveloped and the party failed to mention collateral estoppel by name at trial, the party will be considered to have preserved the use of collateral estoppel for appeal if the party refers to the policies underlying the related doctrines of collateral estoppel. *Wedel*, 681 N.E.2d at 1130.

At the involuntary commitment hearing, Heald's counsel noted in her closing argument,

> Twenty years ago, when it was convenient for the State, um to fight against an insanity defense and have her convicted just as guilty of the crime. [sic] Um, they convinced the judge and jury that mental illness played no part in this act ... and it seems ironic that, that now she's three days away from being released that the State would wish to say that they want sort of a do over or a second bite at the apple and to say that this was because of a mental illness.

Tr. pp. 42–43.

We hold that this remark at the commitment hearing, to the effect that the issue in her murder trial was the same issue in her commitment hearing, and her use of the term "second bite at the apple" sufficiently preserves Heald's use of collateral estoppel for appeal under *Wedel*, 681 N.E.2d at 1130.

## B. *Heald's use of collateral estoppel.*

■ In reviewing the trial court's refusal to apply collateral estoppel, we apply an abuse of discretion standard. *Shell Oil,* 705 N.E.2d at 969 (citing *Wilcox v. State,* 664 N.E.2d 379, 381 (Ind.Ct.App.1996)).

As previously stated, collateral estoppel has been divided into two categories, offensive and defensive collateral estoppel. *Bartle,* 768 N.E.2d at 917 (citing *Tofany,* 616 N.E.2d at 1037). Offensive collateral estoppel involves a situation where the plaintiff seeks to foreclose the defendant from litigating an issue that the *defendant had previously litigated unsuccessfully* in an action with another party. *Bartle,* 768 N.E.2d at 917 (emphasis added) (citing *Parklane Hosiery,* 439 U.S. at 326 n. 4, 99 S.Ct. 645). Defensive collateral estoppel involves a situation where the defendant seeks to prevent a plaintiff from asserting a claim which the *plaintiff had previously litigated and lost. Bartle,* 768 N.E.2d at 917 (emphasis added).

■ An evaluation of Heald's claim of collateral estoppel reveals that Heald is neither asserting offensive nor defensive collateral estoppel. The State has not previously litigated the issue of Heald's mental competency unsuccessfully as either a defendant or—even assuming it is permissible for a criminal prosecution to be used as the basis for collateral estoppel in a civil proceeding—as a prosecutor-plaintiff. *See In re Estate of Nye,* 157 Ind.App. 236, 249, 299 N.E.2d 854, 863 (1973) (noting that "a party who has once fought out a question in litigation with the other party is precluded from fighting it out again").

Both offensive and defensive collateral estoppel require that the party to whom collateral estoppel is asserted against to have unsuccessfully litigated the issue in a previous proceeding. Because the State has not unsuccessfully "fought out" the issue of Heald's sanity, Heald's claim of collateral estoppel does not fall within offensive or defensive collateral estoppel, and thus, is not collateral estoppel at all. Only after the State has unsuccessfully litigated the issue of Heald's sanity may collateral estoppel potentially be asserted against it. Therefore, we need not reach the question of whether a criminal verdict may be used to collaterally estop a civil proceeding or whether the commitment of Heald, based upon her current sanity may be estopped by a twenty-year old judgment that refused to acknowledge her mental illness.

## II. Sufficiency of Evidence

■ When reviewing a challenge to the sufficiency of evidence, we look to the evidence most favorable to the trial court's decision and all reasonable inferences to be drawn therefrom. *In re Commitment of C.A. v. Ctr. of Mental Health,* 776 N.E.2d 1216, 1217 (Ind.Ct.App.2002) (citing *In re Commitment of G.M.,* 743 N.E.2d 1148, 1150–51 (Ind.Ct.App.2001)). If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, the order must be affirmed, even if other reasonable conclusions are possible. *In re Commitment of C.A.,* 776 N.E.2d at 1217.

A court may order an individual involuntarily committed if a petitioner proves by clear and convincing evidence that: (1) the individual is mentally ill and (2) either dangerous or gravely disabled; and (3) detention or commitment of the individual is appropriate. Ind.Code § 12–26–2–5(e) (2001). A regular commitment, as opposed to an emergency or temporary commitment, may be made where the individual is reasonably expected to require custody, care, or treatment in a facility for more than ninety days. Ind.Code §§ 12–26–7–1(2001); 12–26–1–1(4) (2001).

## A. The "mental illness" element

Mental illness, for purposes of regular civil commitment, is "a psychiatric disorder that substantially disturbs an individual's thinking, feeling, or behavior and impairs the individual's ability to function." Ind. Code § 12–7–2–130 (2001).

There are several aspects of Dr. Payne's testimony from which a reasonable person could conclude that Heald is mentally ill. Dr. Payne diagnosed Heald as suffering from "paranoid schizophrenia" and testified that she is "severely mentally ill." Appellant's App. pp. 14–15; Tr. pp. 12–14. Dr. Payne further stated that "[Heald] has a complex delusional system. In fact, probably the most complex I've ever seen." *Id.*

Dr. Payne observed that "there is a marked paranoid ideation noted in [Heald] and when pressed with pertinent issues, she can be easily disturbed." Appellant's App. p. 14. Dr. Payne also found that Heald's insight and judgment are extremely poor. *Id.*

██ Because a person could reasonably rely on this information to conclude that Heald is mentally ill, we will not disturb the trial court's finding that the State satisfied the "mentally ill" element of Indiana Code section 12–26–2–5(e). *See In re Commitment of C.A.*, 776 N.E.2d at 1217.

## B. The "dangerous" element

██ The term "dangerous," for involuntary commitment purposes, means "a condition in which an individual, as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." Ind.Code § 12–7–2–53 (2001); *In re Commitment of C.A.*, 776 N.E.2d at 1218. Heald maintains that

there was insufficient evidence presented to satisfy this element. Heald's claim is based largely on the fact that Heald has not committed any acts of violence while she has been incarcerated. Br. of Appellant at 13–14.

Dr. Payne testified that Heald "definitely" presents a danger to herself and others. Tr. pp. 14–15. In this testimony, Dr. Payne noted that people who continue to have the same delusions [delusions that Heald continues to experience], are very vulnerable to do the "the same thing"—referring to Heald's murder of Smith—when under stress. Tr. p. 15.

When asked whether Heald's lack of violence at the Women's Prison is inconsistent with his testimony that Heald presents a danger to others, Dr. Payne explained that people such as Heald, who exhibit mental illness, are monitored by numerous members of the prison staff, including counselors, psychiatrists, and psychologists, and this monitoring prevents such people from exhibiting the effects of their mental illness. Tr. p. 15. Dr. Payne further explained that when delusional people such as Heald are released into the outside world "they start having real relationships, real life situations where there's nobody supervising, [sic] under stress they tend to do the same thing." Tr. p. 18.

██ A person could reasonably conclude from this testimony that if Heald were released, Heald's continued delusions would once again result in the type of behavior that culminated in Smith's brutal murder twenty years ago. For this reason, we will not disturb the trial court's finding that Heald poses a danger to society if released.[4]

---

4. Because Indiana Code section 12–26–2–5(e) requires either a finding of dangerous behav-

ior "or" grave disability—and not a finding of both—we need not consider whether there

## C. *The "appropriateness" element*

In order for a court to commit someone under Indiana Code section 12–26–2–5(e), the commitment must be appropriate. *Id.*

■ Heald does not acknowledge her mental illness and refuses to take anti-psychotropic medication. Dr. Payne testified that because of her age, hypertension, and health problems, Heald needs to be in inpatient care first, rather than released with prescriptions provided on an outpatient basis. Furthermore, there is no evidence that indicates that a friend or family member intends to look after Heald upon her release. Finally, although the Prison had been looking at group homes or transitional housing for Heald, it had no success in placing Heald.

Because there was no evidence presented that someone would monitor Heald's medication, delusions, mental illness, and care for and support her, the trial court's finding that it is appropriate to place Heald in inpatient commitment as a result of her mental illness will not be disturbed.

## Conclusion

The trial court was correct in finding that the doctrine of collateral estoppel does not apply to Heald's commitment hearing, and there was sufficient evidence to support Heald's commitment under Indiana Code chapter 12–26–7.

Affirmed.

BAKER and RILEY, JJ., concur.

was sufficient evidence to support the trial court's finding that Heald was gravely disabled.