**MICROVOTE GENERAL CORPORATION, Appellant–Petitioner,**

v.

**INDIANA ELECTION COMMISSION, Appellee–Respondent.**

No. 49A02–0910–CV–975.

Court of Appeals of Indiana.

March 29, 2010.

---

John R. Price, Price–Owen Law, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Petitioner, MicroVote General Corporation (MicroVote), appeals the trial court's Order denying MicroVote's Petition for Judicial Review and Petition for Stay of Enforcement of the final agency order issued by the Appellee–Respondent, the Indiana Election Commission (IEC). The IEC's final order prohibits MicroVote from marketing, leasing or selling voting systems in Indiana for eighteen months, with additional reporting requirements for three and one-half years thereafter.

We affirm.

## ISSUES

MicroVote raises three issues on appeal, which we restate as follows:

(1) Whether the trial court erred in affirming the IEC's final order on *res judicata* grounds in light of a previous determination by the Indiana Secretary of State during an administrative hearing;

(2) Whether the trial court erred in affirming the IEC's final order on collateral estoppel grounds; and

(3) Whether the trial court erred in determining that the IEC's final order, which imposed penalties and conditions, did not exceed its statutory authority.

## FACTS AND PROCEDURAL HISTORY

MicroVote is a corporation organized and doing business under the laws of the State of Indiana, with its office located in Indianapolis. The corporation supplies election equipment and electronic voting systems to forty-seven counties in Indiana. In 2005, the Indiana Legislature amended several statutes applicable to electronic voting systems and the vendors of these systems. Under the revised Indiana Code section 3–11–7.5–28(a), any previously issued approval or certification of electronic voting system issued by the IEC "expires October 1 of the year following the year in which presidential electors are elected under [I.C. § ] 3–10–2–3." As a result of this statutory revision, MicroVote's electronic voting system became decertified on October 1, 2005.

Prior to October 1, 2005, MicroVote contacted the IEC seeking clarification of Indiana Code section 3–11–7.5–28(g) and specifically as to whether it would be permissible for MicroVote to continue servicing pre-existing customers after the decertification date. This referenced statutory provision establishes that "A vendor sub-ject to subsection (f) may continue to provide support during the period specified in subsection (f) to a county that has acquired a voting system from the vendor after the vendor certifies that the voting system to be supported by the vendor only includes hardware, firmware, and software approved for use in Indiana." Ind.Code § 3–11–7.5–28(g). Subsection (f) indicates that

> If the commission finds that a vendor has marketed, sold, leased, installed, implemented, or permitted the use of a voting system in Indiana that:
>
> > (1) has not been certified by the commission for use in Indiana; or
> >
> > (2) includes hardware, firmware, or software in a version that has not been approved for use in Indiana;
>
> the commission may revoke the approval granted under this section and prohibit the vendor from marketing, leasing, or selling any voting system in Indiana for a specific period not to exceed (5) years.

A Co–General Counsel for the Indiana Election Division (IED) responded via email, dated September 2, 2005, stating in part:

> I recognize that 'installed, implement and permit the use' language in these statutes could cause you concern as this language could be interpreted to mean that even if the sale was consummated prior to the expiration of certification that the subsequent delivery and installation made pursuant to that legal contract made after the system was no longer certified, could be argued as violating the statute. I do not believe that was the intent of the legislature. [I.C. § ] 3–11–7.5–28(g) indicates inexplicitly that a vendor 'may continue to provide support' to a voting system 'to a county that has *acquired* a voting system from the vendor' after the vendor certified that the voting system to be supported

by the vendor only includes hardware, firmware, and software approved for use in Indiana.

I believe the reference to acquire is the same as 'sale' as used elsewhere in this section. In my view, as long as the sale was consummated while the system was certified then all further activities undertaken to implement the contract for sale and all activities to support the voting system legally sold would not result in a violation of the above statutes.

(Appellant's App. pp. 33–34). A disclaimer was inserted at the bottom of this email with an explicit warning not to rely on the legal interpretation and to seek independent legal advice.

After receiving this email and during the decertification period which commenced on October 1, 2005, MicroVote continued to conduct business in several Indiana counties, including executing contracts in nine Indiana counties for voting equipment with firmware and software versions which had been decertified, marketing its equipment throughout Indiana, public testing in forty-seven counties, and installing uncertified firmware in voting equipment in forty-seven counties.

During the same period, MicroVote also initiated the testing of its electronic voting systems, a mandatory prerequisite to apply for recertification with the IEC. Nevertheless, MicroVote was unable to immediately apply for certification as national testing authorities imposed a nation-wide moratorium on all such testing. This ban was not lifted until March 30, 2006. On April 28, 2006, the IEC approved MicroVote's application for renewal of certification of its voting software. On May 2, 2006, forty-seven Indiana counties used the then current, certified version of MicroVote's electronic voting system in the primary election held on that day.

### A. Administrative Proceedings by the Office of the Secretary of State

Contrary to the IED's advice, the Indiana Secretary of State and the Office of the Secretary of State (OSS) instituted administrative proceedings against MicroVote under Cause No. 06–0001–ED, which later became Cause No. 06–0003–ED, in early April of 2006, charging MicroVote with violating I.C. §§ 3–11–17–1 through 3–11–17–3 by continuing to service its customers after its equipment became decertified. On May 21, 2007, the Administrative Law Judge (ALJ) issued an order finding that MicroVote had violated Indiana's election law on multiple occasions between October 1, 2005 to April 28, 2006. He recommended a penalty of $250,000, increased by costs of $133,562.25. Thereafter on July 20, 2007, the Indiana Secretary of State, acting as the ultimate authority in the OSS proceedings, issued a Final Order Affirming in Part and Modifying in Part Administrative Law Judge's Order Granting the Office of the Secretary of State's Motion for Summary Judgment; Denying MicroVote's Motion for Summary Judgment; and Findings of Fact and Conclusions of law.

On August 20, 2007, MicroVote filed a petition for judicial review of the Secretary of State's decision. On October 2, 2007, the OSS replied by filing a motion to dismiss MicroVote's petition on the basis of an untimely filed record. The following month, on November 27, 2007, the trial court granted the OSS's motion to dismiss. On July 16, 2008, after MicroVote pursued an appeal, the court of appeals affirmed the trial court and the supreme court denied transfer.

### B. Administrative Proceedings by the IED

Before a final order was issued in the OSS proceedings, the IED filed an administrative Complaint before the IEC against MicroVote in Cause No. 2007-01. The

Complaint alleged that MicroVote had violated Indiana Code section 3–11–7.5–28 by (1) illegally selling an uncertified voting system, (2) illegally marketing an uncertified voting system; (3) illegally installing an uncertified voting system; and (4) permitting the use of an uncertified voting system during a period from October 1, 2005 through April 28, 2006. On March 31, 2008, without conducting an evidentiary hearing, the ALJ entered his Order on Cross Motions for Summary Judgment which incorporated facts established in the proceedings initiated by the OSS against MicroVote. In its Order, the ALJ found the following issues conclusively established in the previous administrative proceedings

> a. MicroVote violated the Indiana election Code, Ind.Code § 3–11–7.5–4(d) by marketing its uncertified election equipment in forty-seven (47) counties.
>
> b. MicroVote violated the Indiana election Code, Ind.Code § 3–11–7.5–4(d) by selling its uncertified equipment in ten (10) counties.
>
> c. MicroVote violated the Indiana election Code, Ind.Code § 3–11–7.5–4(d) by installing its equipment in forty-seven (47) counties.
>
> d. MicroVote violated the Indiana election Code, Ind.Code § 3–11–7.5–4(d) by implementing its equipment in forty-seven (47) counties.
>
> e. MicroVote violated the Indiana election Code, Ind.Code §§ 3–22–7.5–10, 3–11–7.5–13, 3–11–7.5–20, 3–11–15–13.1 and 3–11–14–239(d) by installing election systems in forty-seven (47) counties which were inadequate to conduct a general election in Indiana since they would not allow for straight-ticket voting.

(Appellant's App. pp. 11–12). The ALJ imposed a five year prohibition against marketing, leasing, or selling voting systems in Indiana pursuant to I.C. § 3–11–7.5–28(f).

MicroVote timely submitted its Objections to the ALJ's Order of March 31, 2008. Although the IEC permitted the parties to submit additional briefing, the Commission did not conduct any further evidentiary or substantive hearing before ruling on the ALJ's Order. A single meeting was held on June 10, 2008 during which the IEC discussed the ALJ's Order with MicroVote's counsel and the IED. That same day, the IEC issued its Final Order which adopted the findings of fact and conclusions of law contained in the ALJ's Order of March 31, 2008 with a modified penalty. Instead of the five year prohibition against marketing, leasing, or selling voting systems in Indiana, the IEC reduced this prohibition to eighteen months with additional reporting requirements for the three and one-half year after the prohibition. These reporting requirements include the submission of quarterly reports to the IED with information about MicroVote's marketing, sales, and leasing activity in Indiana, and the submission of all contracts for the sale or lease of voting systems thirty days prior to their execution.

On July 18, 2008, MicroVote filed its Verified Petition for Judicial Review claiming that the IEC should have dismissed the proceedings before it based on *res judicata* and collateral estoppels grounds. Alternatively, MicroVote asserted that the penalty imposed was arbitrary and capricious and exceeded the IEC's statutory authority. Following briefing by the parties, the trial court entered a Final Order on May 12, 2009, affirming the IEC.

MicroVote now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

■ While the legislature has granted courts the power to review the action of

state government agencies taken pursuant to the Administrative Orders and Procedures Act, this power of judicial review is limited. *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251, 1257 (Ind.2000). A court may only set aside agency action that is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law: or (5) unsupported by substantial evidence. *See* Ind.Code § 4–21.5–5–14(d). While an appellate court grants deference to the administrative agency's findings of fact, no such deference is accorded to the agency's conclusions of law. *LTV Steel Co.*, 730 N.E.2d at 1257.

## II. *Res Judicata*

MicroVote contends that the trial court erred when it failed to acknowledge that *res judicata* barred the proceedings before the IEC since the cause, which involves the same claims and the same parties or their privies, had already been adjudicated on its merits in the proceedings before the OSS.

■ The doctrine of *res judicata* bars the litigation of a claim after a final judgment has been rendered in a prior action involving the same claim between the same parties or their privies. *Small v. Centocor, Inc.*, 731 N.E.2d 22, 26 (Ind.Ct.App. 2000), *reh'g denied, trans. denied.* The principle behind this doctrine, as well as the doctrine of collateral estoppel, is the prevention of repetitive litigation of the same dispute. *Id.* The following four requirements must be satisfied for a claim to be precluded under the doctrine of *res judicata*: 1) the former judgment must have been rendered by a court of competent jurisdiction; 2) the former judgment must have been rendered on the merits; 3) the matter now in issue was, or could have been, determined in the prior action; and 4) the controversy adjudicated in the former action must have been between the parties to the present suit or their privies. *Id.*

■ When applying *res judicata* to administrative proceedings, Indiana courts traditionally examine whether 1) the issues sought to be estopped were within the statutory jurisdiction of the agency; 2) the agency was acting in a judicial capacity; 3) both parties had a fair opportunity to litigate the issues; and 4) the decision of the administrative tribunal could be appealed to a judicial tribunal. *Weiss v. Indiana Family & Soc. Servs. Admin., Div. of Disability, Aging and Rehab. Servs.*, 741 N.E.2d 398, 402 (Ind.Ct.App.2000), *trans. denied.*

MicroVote does not dispute and the IEC agrees that the trial court properly concluded that the Secretary of State was vested with the authority to render an order in Cause No. 06–0003–ED. In addition, both parties also agree that the trial court properly determined that the order rendered in Cause No. 06–0003–ED was a final judgment on the merits for *res judicata* purposes. However, MicroVote takes issue with the trial court's conclusion that the claim raised in Cause No. 06–0003–ED is not sufficiently identical to the claim raised in Cause 2007–01 and with the conclusion that the parties in both Causes are different. We will evaluate each contention in turn.

### A. *Identity of Claims*

■ With regard to the *res judicata* requirement that the matter now in issue was, or could have been, determined in the prior action, the trial court found in its order

5. Under Ind.Code § 3–11–7.5–28, the OSS does not have the right to intervene in litigation conducted by the IEC. The Secretary could not have imposed any penalties under that section, and did not do so in this Final Order. This means that the matter now in issue was not, and could not have been, determined in that suit. The issue before the OSS was should a civil penalty be imposed for a violation of elections law. The issue before the IEC was should MicroVote's certification be revoked in Indiana. This is essentially a licensing function wherein the IEC determines who may or may not market, sell, lease, install, implement, or use a voting system in Indiana. The third element of *res judicata* is not satisfied.

(Appellant's App. p. 19).

Disputing the trial court's finding, MicroVote contends that the critical factor in finding identical claims for *res judicata* is not whether two agencies have the same statutory authority to impose the same penalties for the same conduct but whether the first ruling agency has the statutory authority to make a final determination of the factual issues for which the second agency would impose additional penalties. In essence, MicroVote asserts that if identical evidence supports the issues in both actions, then there is a similarity of claims satisfying *res judicata*. On the other hand, the IED claims that the IEC and the Secretary of State each possess distinct statutory authority to impose different penalties. Given their distinct jurisdictional posture, the IEC and the Secretary of State necessarily evaluated different evidence to impose their sanctions.

 As to *res judicata*, a party is not allowed to split a cause of action, pursuing it in a piecemeal fashion and subjecting a defendant to needless multiple suits. *Indiana State Highway Comm'n v. Spei-*

*del*, 181 Ind.App. 448, 392 N.E.2d 1172, 1175 (1979). However, two or more separate causes of action may arise from the same tortious act, and in such case a judgment on one action does not bar suit on the second. *Id.* In this light, the most critical question for the application of *res judicata* is whether the present claim was within the issues of the first or whether the claim presents an attempt to split a cause of action or defense. *Biggs v. Marsh*, 446 N.E.2d 977, 982 (Ind.Ct.App. 1983). It has generally been said that the test for making this determination is whether identical evidence will support the issues involved in both actions. *Id. See also Indiana State Dept. of Health v. Legacy Healthcare, Inc.*, 752 N.E.2d 185, 190–91 (Ind.Ct.App.2001).

Turning to the case at hand, we conclude that identical evidence supported the claims brought before the Secretary of State in Cause No. 06–0003–ED and the later claims pursued before the IEC in Cause No. 2007–01. In Cause No. 06–0003–ED, the Secretary of State was required to find that MicroVote had "knowingly, recklessly, or negligently s[old], lease[d], install[ed], implement[ed], or permit[ted] the use of a voting system in an election conducted in Indiana in violation of Indiana's election laws," in order to impose a civil penalty for the same. I.C. §§ 3–11–17–2; 3–11–17–3. The OSS presented evidence establishing these requirements.

Similarly, in Cause No. 2007–01, the claim was based on a violation of I.C. § 3–11–7.5–28(f) which authorizes the IEC to revoke its prior approval of a voting system and prohibit an election system vendor from marketing, leasing, or selling any voting system in Indiana for a specific period not to exceed five years if the IEC "finds that a vendor has marketed, sold, leased, installed, implemented, or permit-

ted the use of a voting system in Indiana that: (1) has not been certified by the commission for use in Indiana; or (2) includes hardware, firmware, or software in a version that has not been approved for use in Indiana[.]"

Thus, given the context of the two statutes, the IEC and Secretary of State both had to first determine whether MicroVote had marketed, sold, leased, installed, implemented, or permitted the use of a voting system in Indiana contrary to law. In reaching its conclusion in Cause No. 2007–01, the IEC did not conduct an evidentiary hearing or ask the parties to submit additional evidence but instead took the findings in Cause No. 06–0003–ED and used the same evidence to impose its own penalties. Specifically, in Cause No. 2007–01, forty-eight of the forty-nine paragraphs comprising the Findings of Fact section of ALJ's March 31, 2008 order were quotations taken from orders issued in Cause No. 06–0003–ED.

Even though the main difference between the statutes is the finding of an uncertified voting system in I.C. § 3–11–7.5–28(f), the ALJ in his order of May 21, 2007 which granted the Secretary of State's motion for summary judgment nevertheless found exactly that. Specifically, the ALJ concluded:

*C. MicroVote has committed at least fifty-seven (57) violations that fall within Title 3*

1. I.C. § 3–11–7.5–4(d) states that "[a]n electronic voting system may not be marketed, sold, leased, or implemented in Indiana before the application for certification of the system is approved by the commission." [I.C.] § 3–11–7.5–4(d)

i. As of October 1, 2005, MicroVote did not have any electronic voting systems that were certified in the State of Indiana, since its system that was in use up to that point was statutorily decertified on October 1, 2005 and the new system was not completed until March and not certified by the [IEC] until April 28, 2006. See [I.C] § 3–11–7.5–28(a); Findings of Fact ¶ E.28.

ii. Accordingly, MicroVote did not have a product that it could legally market, sell, or lease anywhere in Indiana from October 1, 2005 to April 28, 2006.

iii. Despite this fact, MicroVote marketed and sold uncertified equipment prior to the May 2006 primary election by (a) signing new sales contracts in ten counties, (b) sending out numerous pricing estimates for purchase of its equipment and (c) emailing counties with quotes and estimates for future purchases.

(Appellee's Suppl. App. pp. 36–37).

As such, the factual issues ruled on by the Secretary of State in Cause No. 06–0003–ED covered the same factual issues presented by the IED in Cause No. 2007–01. Evidence was presented and ruled on in both Causes with regard to MicroVote's marketing, sale, lease, installation, implementation or permitted use of its voting system in forty-seven counties from October 1, 2005 to April 28, 2006. The only factual difference in both proceedings is the penalty imposed. However, we agree with MicroVote that to impose any penalty under I.C. § 3–11–7.5–28(f) in Cause No. 2007–01, the IED still had to present and the IEC had to rule on the exact same evidence as that used and ruled on in Cause 06–0003–ED. In sum, in both proceedings MicroVote was penalized for the same alleged misconduct covering the same period of time based on the same evidence. Therefore, we find that the third requirement of *res judicata* is satisfied.

## B. *Parties or Their Privies*

 With regard to the fourth *res judicata* requirement—the controversy adjudicated in the former action must have been between the parties to the present suit or their privies—the trial court ruled as follows

6. "A 'party' is one who is directly interested in the subject matter and has a right to make defense or to control the proceedings and to appeal from the judgment ... [C]ourts look beyond the nominal parties and treat all those whose interest are involved in the litigation and who conduct and control the action or defense, as real parties, and hold them concluded by any judgment which may have been rendered."

7. The [IEC] is established by Ind. Code § 3–6–4.1–1. It is bipartisan in composition with the Commissioners of the IEC being appointed by the Governor following nomination by the chairperson of the respective major political parties. I.C. § 3–6–4.1–2. The IEC is charged with administering Indiana election laws and governing the "fair, legal and orderly conduct of elections." I.C. § 3–6–4.1–14(a). Before a ballot card or electronic voting system is used in an election, it must be approved by the IEC. I.C. § 3–11–7–1 and I.C. § 3–11–7.5–1. The approval of electronic voting machines and their use in the State of Indiana is not made by the OSS. In addition, the OSS does not have the authority to revoke the use of a particular vendor's electronic voting system in this state. The statutory authority is only vested with the IEC to revoke a license to operate an electronic voting system in Indiana when a vendor is not in compliance with Indiana Election Law. I.C. § 3–11–7.5–26. If the IEC determines that a vendor has marketed, sold, leased, installed, implemented, or permitted the use of a voting system that has not been certified by the IEC, it is not only authorized to revoke the approval of a voting system, but may also prohibit a vendor from marketing, leasing or selling any voting system in Indiana for up to five (5) years. I.C. § 3–11–7.5–28(f). The penalty authorized under I.C. § 3–11–7.5–28(f) is a licensing decision and is different than the civil penalty permitted under I.C. § 3–11–17–1 et seq. The IEC is responsible for "Specify[ing] procedures and fees for the processing of an application from a vendor for voting systems approval and testing" under Ind.Code § 3–6–4.1–14.

8. Under Ind.Code § 3–6–4.2–2(a), the Secretary of State must discharge "all ministerial duties related to the administration of elections by the state." The Secretary of State is an elected official and a constitutional officeholder. The OSS's jurisdiction over elections and election law is provided by the General Assembly. The OSS has jurisdiction over Voting Systems Violations pursuant to I.C. § 3–11–17–1 *et seq.* and the authority to access a civil penalty upon determination by the Secretary that a voting system violation has occurred.

9. The IED is established within the OSS by Ind.Code § 3–6–4.2–1. It is charged with assisting both the IEC and the Secretary of State in the administration of elections. I.C. § 3–6–4.2–2(b). The IED is a bipartisan agency whose Co–Directors are appointed by the Governor following nomination by the chairperson for the respective major political parties. I.C. § 3–6–4.2–3. This division of the OSS is a hybrid office which acts independently from the OSS under the leadership of its Co–Directors and serves in a variety of roles involving the Indiana electoral process. For example, the IED assists the OSS in implement-

ing provisions of the Help America Vote Act. I.C. § 3–6–4.2–2.5. The IED is also charged with carrying out the policies and recommendations of the IEC. I.C. § 3–6–4.2–3. In addition, the IED independently functions to maintain a complete set of precinct maps in Indiana, provides instruction to county election boards throughout the State of Indiana concerning state and federal election laws. I.C. § 3–6–4.2–12 and 14. The IED is also independently responsible for coordinating state responsibilities under the National Voter Registration Act, certifying candidates to be placed on the ballot, and tabulating election results filed by county election boards. Finally, the Co–Directors of the IED are not hired by the Secretary nor are they members of the Secretary's Staff. 10. The IED was not a party to the administrative proceedings conducted by the Secretary of State, nor did it have a right to intervene in those proceedings. Under Ind.Code § 3–6–4.2–2(a), the Secretary of State must discharge "all ministerial duties related to the administration of elections by the state." Under Ind.Code § 3–11–17–3, the Secretary of State may impose a fine of up to $300,000.00 in addition to associated investigative costs, when he finds that a voting system vendor had violated Indiana election law. 11. The IEC has no authority to bring claims under Ind.Code § 3–11–17–3. It has authority to bring claims under Ind. Code § 3–11–7.5–28, which gives the IEC authority to both grant and revoke certification to voting system vendors, and to prohibit a vendor from marketing, leasing, or selling a voting system in Indiana if the IED finds that the vendor has marketed, sold, leased, installed, implemented, or permitted the use of a voting system in Indiana that: (1) has not been certified by the commission for use in Indiana; or (2) includes hardware, firmware, or software in a version that has not been approved for use in Indiana.

12. The term privity describes the identity of interests that may connect persons to such an extent that one not a party to an action may nevertheless be bound by the judgment in that action.

13. The OSS and the IEC are not in privity. While the OSS and the IEC have both duties related to Indiana elections, their interests (as statutorily defined) are different. The OSS seeks financial penalties against defendants who have violated Indiana election law. The IEC is responsible for granting and revoking certification of electronic voting systems. Their interests are not the same, and one should not be bound by actions involving the other.

14. The IEC did not have the duty or right to participate in the administrative proceedings conducted by the OSS. The [c]ourt finds that the fourth element of *res judicata* has not been met because the matter adjudicated by the OSS did not involve the IEC. Therefore the parties were not the same nor was there privity present. For this reason, the IEC is not bound by the judgment of the Secretary of State in [ ] Cause No [ ] 06–003–ED.

(Appellant's App. pp. 19–22) (some citations omitted).

MicroVote contends that, at the very least, the IED was in privity with the OSS as the IED is depicted as a division of the OSS and is established within the OSS. On the other hand, the IEC asserts that because the OSS and IED are different agencies with distinct responsibilities and duties, they are not linked in privity. It maintains that the IEC and IED had no control or authority over the functions of

the Secretary of State and, in turn, the Secretary of State does not have control or authority over the functions of the IEC or the IED when it is assisting the Commission.

The term privity describes the relationship between persons who are parties to an action and those who are not parties to an action but whose interests in the action are such that they may nevertheless be bound by the judgment in that action. *Small*, 731 N.E.2d at 27–28. Whereas a "party" is one who is directly interested in the subject matter and has a right to make a defense or control the proceedings, a "privy" is one who after rendition of the judgment has acquired an interest in the subject matter affected by the judgment. *Smith v. Midwest Mutual Insurance Co.*, 154 Ind.App. 259, 289 N.E.2d 788, 793 (1972). The term includes those who control an action, though not a party to it, and those whose interests are represented by a party to the action. *Small*, 731 N.E.2d at 27–28. As such, an entity does not have to control a prior action, or be a party to a prior action, for privity to exist. *See id.* Therefore, in determining the parties for *res judicata* purposes, this court looks beyond the nominal parties and treats those whose interest are involved as the real parties. *State v. Speidel*, 181 Ind.App. 448, 392 N.E.2d 1172, 1176 (1979).

In Cause No. 06–0003–ED, MicroVote was the respondent and the OSS the petitioner, whereas in the later Cause No. 2007–01, MicroVote was again the respondent but with the IED as the petitioner. MicroVote now contends that the IED was at the very least a privy of the OSS in Cause 06–0003–ED, if not a party itself.

Statutorily, the legislature established the IED as a division of the OSS. *See* I.C. § 3–6–4.2–1. The other three divisions within the OSS are the business services division, the securities division, and the dealer services division. *See http://www. in.gov/sos/* (last visited Febr. 11, 2010). Because the IED is the only division within the OSS that handles election issues, the only OSS personnel who could or would have been involved in Cause No. 06–0003–ED were IED personnel. Furthermore, although the Secretary of State is the sole authority to impose civil penalties, it is the IED who controls and administers the account which collects these civil penalties. I.C. § 3–11–17–6(b) & (d). At the same time, it is also this account, controlled by the IED, which provides the financial means to enforce the statutory regulations concerning the ballot card voting system, the approval of electronic voting systems, the technical oversight program, and general voting system violations, such as I.C. § 3–11–17–2—the statute used by the OSS to impose a civil penalty on MicroVote. *See* I.C. § 3–11–17–6(a).

Nevertheless, although the IED is statutorily created as a division of the OSS and both appear to be intertwined, the legislature has provided differently for each entity and has given each entity its own separate authority. The IED is a bipartisan agency whose co-directors are appointed by the Governor following nomination by the chairman for the respective major political parties. *See* I.C. § 3–6–4.2–3. The IED independently functions to maintain a complete set of precinct maps in Indiana, provides instructions to county election boards concerning state and federal election law requirements, and reports to federal agencies in compliance with federal election laws. *See* I.C. § 3–6–4.2–12; –14. The IED is responsible for coordinating state responsibilities under the National Voter Registration Act, certifying candidates to be placed on the ballot, and tabulating election results filed by county election boards. I.C. § 3–7–11–1; –16; § 3–

12-5-7. In addition, the IED is charged with carrying out the policies and recommendations of the IEC. *See* I.C. § 3-6-4.2-3. The IEC, in turn, is the only entity authorized to approve and revoke its approval of a voting system and is empowered to prohibit the vendor from marketing, leasing or selling any voting system in Indiana for up to five years. *See* I.C. § 3-11-7.5-28(f). This licensing determination is within the IEC's exclusive jurisdiction.

On the other hand, the Secretary of State is a constitutional officeholder, elected statewide. Indiana Const. art. VI § 1. The Secretary's jurisdiction over elections and election law is provided by the General Assembly. He has jurisdiction over Voting System Violations pursuant to I.C. § 3-11-17-1 *et seq.* and the authority to assess a civil penalty upon finding that a voting system violation has occurred, as here in Cause No. 06-0003-ED.

Based on the totality of the evidence before us, we agree with the trial court that MicroVote failed to satisfy the privity requirement of *res judicata.* While the OSS and the IED both have duties related to Indiana's elections, their respective duties are significantly different. Statutorily, the OSS cannot order the sanctions provided for in I.C. § 3-11-7.5-28 and the IEC could not order the penalties provided for in I.C. § 3-11-17-3. In other words, as the OSS's and IED's responsibilities are different, their ultimate interests in pursuing these responsibilities are necessarily distinct: whereas the OSS is focused on civil penalties, only the IED and IEC can impose a revocation of a previous issued license for an electronic voting system. As

a result, we conclude that *res judicata* did not bar the proceedings before the IEC.

### III. *Collateral Estoppel*

 Next, MicroVote contends that the trial court erred when it failed to acknowledge that the claims asserted by the IED in Cause No. 2007-01 were premised on the same issues of law and fact which were ruled on and decided in Cause No. 06-0003-ED and therefore the IED's action should have been foreclosed entirely.[1]

 Collateral estoppel—also referred to as issue preclusion—bars the subsequent litigation of an issue necessarily adjudicated in a former suit. *Shell Oil v. Meyer,* 705 N.E.2d 962, 968 (Ind.1998). In that situation, the former adjudication will be conclusive in the subsequent action even if the two actions are on different claims. *Bartle v. Health Quest Realty VII,* 768 N.E.2d 912, 917 (Ind.Ct.App. 2002), *trans. denied.* However, the former adjudication will only be conclusive as to those issues which were actually litigated and determined therein. *Id.*

 Collateral estoppel does not extend to matters that were not expressly adjudicated or to matters that can be inferred from the prior adjudication only by argument. *Id.* The primary consideration in the use of collateral estoppel is whether the party against whom the former adjudication is asserted had "a full and fair opportunity to litigate the issue and whether it would be otherwise unfair under the circumstances" to permit the use of issue preclusion in the subsequent action. *Id.*

---

1. In its brief, MicroVote still references the traditional requirements of collateral estoppels, *i.e.,* identity of parties and mutuality of estoppels. However, in *Sullivan v. Am. Cas. Co. of Reading, Pa.,* 605 N.E.2d 134, 138 (Ind.1992) our supreme court dispensed with these rigid requirements. Instead, now, the prime consideration is whether the party against whom the prior judgment is pled had a full and fair opportunity to litigate the issue and whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel. *Id.*

Review of a trial court's decision regarding the use of issue preclusion is subject to an abuse of discretion standard. *Id.*

██ Collateral estoppel has been divided into two categories: offensive collateral estoppel and defensive collateral estoppel. Offensive collateral estoppel involves a situation where the plaintiff seeks to foreclose the defendant from litigating an issue the defendant had previously litigated unsuccessfully in an action with another party. *Id.* Defensive collateral estoppel involves a situation where a defendant seeks to prevent a plaintiff from asserting a claim which the plaintiff had previously litigated and lost. *Id.* The present case involves the use of offensive collateral estoppel, that is, the IEC used the determination of MicroVote's multiple violations of Indiana election law in Cause No. 06–0003–ED in its own proceedings of Cause No. 2007–01. MicroVote now disputes this application.

██ The offensive use of collateral estoppel has traditionally been viewed as somewhat more problematic than the defensive use of collateral estoppels. However, our supreme court has held that offensive collateral estoppel may be used, subject to certain requirements, as it tends to prevent unnecessary relitigation of issues and promotes consistent trial court judgments. *Tofany v. N.B.S. Imaging Sys. Inc.,* 616 N.E.2d 1034, 1038 (Ind. 1993). Determining the appropriateness of offensive collateral estoppel involves two considerations: (1) whether the party to the prior action had a full and fair opportunity to litigate the issue; and (2) whether it is otherwise unfair to apply collateral estoppel to prevent relitigation of the same issue. *Eichenberger v. Eichenberger,* 743 N.E.2d 370, 375 (Ind.Ct.App.2001).

In *Tofany,* the Indiana supreme court discussed the factors to be considered in a court's determination of whether offensive collateral estoppel should be utilized. *Tofany,* 616 N.E.2d at 1038. The court stated that:

> The trial court may consider privity, the defendant's incentive to litigate the prior action, the defendant's ability to defend the prior action, and the ability of the plaintiff to have joined the prior action. When considering the defendant's incentive to litigate, the trial court may consider the interest at stake for the defendant as well as how the defendant perceived this interest. For example, did the defendant have its most experienced litigator in the prior action or, instead, did the defendant rely on a less experienced litigator? Similarly, the trial court may consider whether the forum in which the action was defended allowed the defendant to participate in the full range of discovery. For example, was the forum inconvenient thus preventing the defendant from presenting witnesses or from taking depositions.

*Id.* at 1038–39. Our supreme court added that these factors were not exhaustive; rather, they merely provided the framework for a court to utilize in its determinations. *Id.* at 1038.

In applying offensive collateral estoppel against MicroVote, the ALJ noted in his Order on Cross–Motions for Summary Judgment of March 31, 2008 that

> 5. Additionally, none of the issues normally associated with an unfair application of collateral estoppel are present here. Specifically, where (a) the defendant had little incentive to vigorously litigate the first action either because the damages were small or nominal, or because future suits were not foreseeable; (b) where the judgment relied upon for estoppel is inconsistent with one or more previous judgments in

which the defendants were successful; or (c) where procedural opportunities are available to the defendant in the latter action which are unavailable to him in the previous action and which would likely affect the result, unfairness may result. Here, MicroVote faced a significant monetary penalty in [Cause No. 06–0003–ED], had all of the procedural opportunities available to it in that action, and there is no known judgment to which this is inconsistent.

6. [ ] All of the factors allowing for application for *res judicata* against MicroVote are met here. Accordingly, while the [Cause No. 06–0003–ED] cannot bar the [IEC], who was not a proper party and thus did not have the opportunity to litigate the issues in this proceeding, it does prevent MicroVote from re-litigating facts established in that proceeding.

7. Indeed, there are sound reasons not to re-litigate here the facts established in [Cause No. 06–0003–ED]. Obviously, to re-litigate those issues would not be the most economical way to proceed for any party. Moreover, those facts as established prevent inconsistent orders and adjudications. Of course, application of [Cause No. 06–0003–ED] can only be done if MicroVote had a full and fair opportunity to litigate that matter. Here, there is no doubt that it did. Indeed, it admits this is the case.

8. In addition, MicroVote cannot genuinely [express] surprise at the [IEC] seeking to revoke its approval based, at least in part, on [Cause No. 06–0003–ED] and the facts and conclusion decided therein. In other words, the existence of that action should not trump the [IEC's] statutory authority.

9. Moreover, because of the designations of both parties, the [IEC] has had an opportunity to review the record and

findings and conclusions of the ALJ in [Cause NO. 06–0003–ED] and sees no reason to deviate from those findings and conclusions . . . .

(Appellant's App. pp. 18–19) (internal citations omitted).

We agree. We find no error in the application of offensive collateral estoppel in the proceedings before the IEC. The record reflects that MicroVote had a full and fair opportunity to litigate the issue of its violations and now allowing MicroVote to relitigate of this issue would be unfair under the circumstances. Therefore, we affirm the trial court.

### IV. *Statutory Authority for the Sanctions Imposed by the IEC*

As a final argument, MicroVote contends that the trial court erred by holding that the IEC's Final Order which imposed penalties and conditions did not exceed its statutory authority.

In its Final Order, the IEC concluded as follows

> After considering the record in this matter, the ALJ's Order, as well as the objection and briefs of the parties, the Commission, at its meeting of June 10, 2008, hereby affirms by a vote of 4 to 0, said ALJ's "Order on Cross–Motions for Summary Judgment" and adopts it as a Final Order in this proceeding, *with the following modifications,* pursuant to its authority under [I.C. § ] 4–21.5–3–29(b)(2).
>
> The modifications to the ALJ's Order are as follows:
>
> 1. In the judgment portion of the Order, [the] ALJ [ ] states that: "The Division requests a five (5)year decertification and injunction. After considering the violations at issue and established in [Cause No. 06–0003–ED], and the defenses raised by Mi-

croVote in both actions, the Indiana Election Commission revokes MicroVote's approval of its electronic voting system and prohibits MicroVote from marketing, leasing or selling any voting system in Indiana for five years, subject to the provisions in Ind.Code § 3–11–7.5–28(g), the specific dates of which shall be determined by the Commission."

The Commission removes this language from the Final Order

2. As its Final Order, the Commission will not rescind the approval of MicroVote's electronic voting systems.

3. MicroVote is prohibited from leasing or selling any voting system in Indiana for five (5) years from the date of this order, or June 20, 2013.

4. MicroVote may continue to market its products in Indiana. However, from the date of this order through December 31, 2009, MicroVote must notify prospective customers that its products may not be *sold* in the State of Indiana until after December 21, 2009. MicroVote must also provide any prospective customers in the State of Indiana with a copy of this Final Order.

5. As of January 1, 2010, the Commission's Order of Prohibition will be **STAYED** for the remainder of the five (5) years, or until June 20, 2013.

6. During the period the Order is stayed, MicroVote's business activities in Indiana will be subject to the following terms and conditions:

 a. MicroVote must fulfill all of its contractual obligations to its Indiana customers.

 b. MicroVote must abide by all election laws.

 c. MicroVote must submit quarterly reports to the Indiana Election Division (IED). Those reports must include information about all of MicroVote's marketing, sales and leasing activity in this state.

 d. All contracts for the sale or leasing of MicroVote systems in Indiana must be submitted to the IED thirty (30) days prior to their execution.

7. From the entry of this order, any finding by the Indiana Election Commission and/or the Indiana Secretary of State that MicroVote has violated Indiana election law or any of the terms and conditions set our above will result in an immediate termination of the Stay.

(Appellant's App. pp. 51–52).

In imposing these remedial measures, the IEC relied on Indiana Code section 3–11–7.5–28 which states in pertinent part

(f) If the commission finds that a vendor has marketed, sold, leased, installed, implemented, or permitted the use of a voting system in Indiana that:

 (1) has not been certified by the commission for use in Indiana; or

 (2) includes hardware, firmware, or software in a version that has been approved for use in Indiana;

The commission may revoke the approval granted under this section and prohibit the vendor from marketing, leasing, or selling any voting system in Indiana for a specific period not to exceed five (5) years.

(g) A vendor subject to subsection (f) may continue to provide support during the period specified in subsection (f) to a county that has acquired a voting system from the vendor after the vendor certifies that the voting system to be supported by the vendor only includes hardware, firmware, and software approved for use in Indiana.

MicroVote now specifically claims that given the plain language of I.C. § 3–11–

7.5–28, the IEC only has the authority to revoke the certification previously granted to prohibit a vendor from marketing, leasing, or selling any voting system in Indiana for a specific period of time. MicroVote maintains that "[s]ince the IEC did not rescind its prior approval/certification of MicroVote's voting system, it follows under the language of subsection (f) that the IEC cannot impose any prohibition." (Appellant's Br. p. 39). Alternatively, MicroVote asserts that the imposed terms and conditions which subject its business activities to the IEC's scrutiny are contrary to the statute.

Resolution of this issue requires us to interpret the statute. The interpretation of a statute is a legal question that is reviewed *de novo. Sun Life Assur. Co. of Canada v. Indiana Dept. of Ins.*, 868 N.E.2d 50, 55 (Ind.Ct.App.2007), *trans. denied.* Statutory interpretation is the responsibility of the court and within the exclusive province of the judiciary. *Id.* The first and often the last step in interpreting a statute is to examine the language of the statute. *Id.* When confronted with an unambiguous statute, we do not apply any rules of statutory construction other than to give the words and phrases of the statute their plain, ordinary, and usual meaning. *Id.*

Turning to the merits of MicroVote's claims, we first note that the statutory language included in subsection (f) permissively grants the IEC the authority to revoke the approval issued under this section by using the word "may." In addition, the same subsection grants the IEC the power to prohibit the vendor from marketing, leasing, or selling any voting system in Indiana for a specific period not to exceed five (5) years. As such, the IEC is given discretionary power to revoke a vendor's certification and to prohibit the marketing, sale or lease of a voting system

for up to five years. The IEC is not required to first revoke the approval and then to impose penalties.

Furthermore, with respect to the stay imposed by the IEC, we agree with the IEC that this possibility is provided for in the Indiana Administrative Orders and Procedures Act (AOPA). In particular, Indiana Code section 4–21.5–3–31 empowers state agencies to "stay the final order in whole or in part." This is exactly what the IEC did: instead of the five year prohibition against marketing, leasing, or selling voting systems in Indiana, the IEC reduced this prohibition to eighteen months with additional reporting requirements for the three and one-half year after the prohibition. These reporting requirements include the submission of quarterly reports to the IED with information about MicroVote's marketing, sales, and leasing activity in Indiana, and the submission of all contracts for the sale or lease of voting systems thirty days prior to their execution.

Whereas the AOPA grants the IEC the possibility to impose a stay of its penalty, we agree with MicroVote that there is no explicit statutory authority granting the IEC the right to impose reporting sanctions or 'good behavior' requirements during this stayed period. However, in interpreting a statute, we not only attempt to ascertain the meaning and intention of the legislature from the specific phraseology of a statute, but we also consider the design, nature and the consequences that flow from the various interpretations. *Concerned Citizens of West Boggs Lake v. West Boggs Sewer Dist., Inc.*, 810 N.E.2d 720, 723 (Ind.Ct.App.2004). During our consideration, we presume that our legislature intended its language to be applied logically and consistently with the underlying goals and policy of the statute. *Bambi's Roofing, Inc. v. Moriarty*, 859 N.E.2d

347, 353 (Ind.Ct.App.2006). Mindful of these principles, we conclude that the IEC could properly impose reporting requirements during the stayed sanction. For an agency to be able to stay the complete or part of the penalty without an ability to impose 'good behavior' requirements would make the stay in effect meaningless.

Moreover, evaluating the reporting requirements themselves, we cannot say that they rise to the level of arbitrary or capricious action. *See* I.C. § 4–21.5–5–14(d). The initial eighteen month period of the penalty that was not stayed concluded on December 31, 2009. Accordingly, as pointed out by the IEC, the bulk of the prohibition period takes place in a year during which no statewide general or primary elections are held. The total penalty imposed is within the five year statutory period during which the IEC can impose sanctions. *See* 3–11–7.5–28. With respect to the specific reporting requirements imposed during the stay, we note that these conditions fall within the IEC's general authority. *See, e.g.,* I.C. §§ 3–11–7.5–5; 3–11–7.5–7; 3–11–7.5–21. Thus, the Final Order carefully balanced the enforcement goals of the IEC with the needs of the voters and local elections officials.

In sum, we conclude that the discretionary nature of Indiana's election law statute combined with the AOPA, empowers the IEC to sanction a vendor for violating I.C. § 3–11–7.5–28 without de-certifying the vendor's voting equipment. The IEC has the discretion to impose a complete executed penalty or stay part of the penalty and impose additional reporting requirements during this stayed period.

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly affirmed the IEC's Final Order and the IEC's imposed penalties and conditions.

Affirmed.

VAIDIK, J., and CRONE, J., concur.